# EXHIBIT B

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**NORTHERN DISTRICT OF CALIFORNIA**

10

**SAN FRANCISCO DIVISION**

11

ANTHONY GILBERT SANTOS,

12

Plaintiff,

13

v.

Case No. 3:17-cv-02447-RS

14

CARMAX, INC., CARMAX AUTO
SUPERSTORES CALIFORNIA, LLC,
CARMAX BUSINESS SERVICES,
LLC, CARMAX AUTO
SUPERSTORES WEST COAST, INC.,

**REPORT OF FRANK BORRIS**

15
16
17

Defendants.

18
19
20

I, Frank S. Borris, II declare as follows:

21

1.      My name is Frank S. Borris, II.  I am the founder and head of Borris Automotive

22

and Safety Solutions, LLC which I started in 2016.

23

2.      I am personally familiar with the matters set forth in this report and, if called as a

24

witness, could and would readily and competently testify as to them.

25

3.      This report is a preliminary report.  I plan to submit an additional report on other

26

topics.  I may supplement this report as additional facts are obtained.

27
28

CASE NO. 3:17-CV-02447-RS
REPORT OF FRANK BORRIS

**PURPOSE OF MY ENGAGEMENT**

4.      I was retained by Troutman Sanders LLP, attorneys for CarMax to offer opinions including, but not limited to:  the creation and implementation of the National Highway Traffic Safety Administration's ("NHTSA") vehicle identification number ("VIN") look-up system, the manufacturer's process of sending recall notifications to consumers, the problems associated with the manufacturer's processes of sending recalled notification to consumers, how the issuance of a recall differs from the actual existence of a defect within a recall population, and the wide array of causes of motor vehicle fires.  My compensation is $450.00 an hour.

**QUALIFICATIONS**

5.      My resumé is attached to this declaration as **Exhibit A**.  I have provided a report in two other matters and have been deposed previously in connection with a case related to manufacturer cost recovery associated with a recall.  My declaration is based on my 23 years of experience both as a federal regulator and as a private consultant in the area of automotive safety.

6.      I hold a Bachelors of Science degree in mechanical engineering from the University of the District of Columbia.

7.      In 1997, I began my extensive career with the National Highway Traffic Safety Administration ("NHTSA") as a Safety Defects Engineer.  I was responsible for conducting numerous defect investigations, including investigations related to visibility, occupant protection, fuel system integrity, steering, suspension, and power-train components.  I was also responsible for conducting investigations related to potential fire risk, whether caused by electrical or other sources.

8.      In this position, I gained considerable knowledge regarding motor vehicle defects and recalls, including the recall remedy proposed by a manufacturer and assessing the reasonableness of that remedy to mitigate the risk identified by the manufacturer.  I also was heavily involved with assessing the manufacturer's rationale for determining the proper scope of a recall.

9.      I also was closely involved with the timing, workflow and content of communications surrounding recalls, including communications between motor vehicle manufacturers and NHTSA, between NHTSA and consumers, between manufacturers and their

CASE NO. 3:17-CV-02447-RS

REPORT OF FRANK BORRIS

franchise dealers, and between motor vehicle manufacturers and consumers, including recall notices. In addition, I worked closely with NHTSA media affairs to draft statements and press releases conveying information about selected recalls to consumers.

10.      I advanced through the ranks of NHTSA quickly and was promoted to Senior Safety Defects Engineer in NHTSA's Office of Defects Investigation ("ODI") in 2002.

11.      In June 2009, I was appointed Director of NHTSA's Car Allowance Rebate System ("CARS"), commonly known as the "Cash for Clunkers" program. Under my leadership, the regulators responsible for CARS published a federal regulation in the first 30 days of the program and developed an electronic data management system to process information submitted by nearly 22,000 new car dealers. As part of my responsibilities, I oversaw the training and engagement of more than 14,000 contractors and stimulated the purchase of nearly 680,000 fuel-efficient vehicles that were safer than those previously on America's roads.

12.      In January 2011, I was promoted to NHTSA's Director of ODI, a position in which I remained for five years. In this position, I managed a staff of more than 80 employees and contractors charged with identifying and investigating motor vehicle safety issues, managing hundreds of recalls annually, making critical safety information available to the public, and monitoring the flow of information between NHTSA, vehicle manufacturers, and consumers at large.

13.      During my tenure as ODI Director, I oversaw portions of the rulemaking specific to making open recall information available to the public, as required by the federal government's "Moving Ahead for Progress in the 21st Century Act," also known as "MAP-21." This rulemaking led to the development and deployment of NHTSA's recall search by Vehicle Identification Number ("VIN") tool, as well as similar VIN search tools hosted by vehicle manufacturers.

14.      As Director of ODI, I spearheaded a number of innovations at NHTSA, including the creation of a mobile app that permits consumers to file reports with NHTSA related to motor vehicle safety, stay abreast of new recalls, as well as offering consumers other useful information such as child safety seat ratings.

15.     As Director of ODI, I also managed the implementation of and response to major motor vehicle recalls, including, but not limited to, those related to Takata airbags, Jeep Liberty rear-impact fires, and General Motors ignition switches.  These recalls featured extremely large motor vehicle populations and also were subject to intense media and Congressional scrutiny.

16.     In addition to my responsibilities as Director of ODI, I also served as the acting Associate Administrator for Enforcement in late 2015 through early 2016.  During this time, I was heavily involved in the development and implementation of new and innovative consent orders which proved to be a very effective enforcement tool.  In addition, my responsibilities as the acting Associate Administrator for Enforcement included oversight of the Office of Vehicle Safety Compliance and the Office of Odometer Fraud.

17.     In late 2016, I founded Borris Automotive & Safety Solutions, LLC.  Our company provides leadership and unique instruction to the automotive industry.  As head of the company, I provide hands-on consulting services to automotive manufacturers, automotive suppliers, and other automotive industry stake-holders.

## SUMMARY OF OPINIONS

18.     Prior to 2014, the public faced many impediments to obtaining complete, accurate, and current information about open recalls.  As discussed below, these impediments included the lack of a uniform, central source of information about whether a specific vehicle was subject to an open recall.  Another key impediment was the lack of complete and accurate ownership records used by manufacturers to provide mailed recall notices, which was (and remains) the primary way that recall information is provided to consumers.

19.     Congress recognized the existence of these problems in 2012, with the passing of the MAP-21 legislation.  MAP-21 called upon the Secretary of the Department of Transportation to draft rules within one year to make recall information available directly to the public and searchable by VIN.  As discussed below, providing "VIN-specific" recall information was critical in order to advise owners whether their specific vehicle was subject to an open recall.  Make, model, and model year information is not sufficient to provide definitive information whether a specific vehicle is subject to an open recall.  A VIN is a unique, 17-digit alphanumeric identifier that follows

a NHTSA-prescribed algorithm to uniquely identify a motor vehicle sold for use in the United States. In addition, by providing the public with the ability to find definitive, VIN-specific information on open recalls, the expectation was that this tool would help mitigate the known flaws in the manufacturers' mailed recall notification system, *for example*, incomplete or inaccurate registration information used to address mailed notices.

20.     In 2014, NHTSA implemented the VIN Look-up (described more fully below) to respond to the Congressional mandate by making VIN-specific recall information available to the public. The VIN Look-up provided, for the first time, information from all light vehicle and motorcycle manufacturers with a set minimum annual production, in a consistent way and from an authoritative, centralized source. The VIN Look-up permits the public to search for reliable, up-to-date information on open recalls specific to an individual vehicle.

21.     Used motor vehicle dealers, by deliberate design, have been excluded from the motor vehicle recall notification and remediation process. Used motor vehicle dealers are not subject to any provisions of NHTSA's recall regulations. The Federal Trade Commission ("FTC") has also considered the role of used motor vehicle dealers in notifying the public and remediating open recalls, and, as did NHTSA, concluded that used vehicle dealers should have a very limited role in addressing recalls and should be limited solely to using an official government form, the "Buyers Guide," described more fully below.

22.     The fact that a specific vehicle is included in the scope of a recall is not an indication that the vehicle actually contains a safety defect. Due to manufacturer traceability constraints, it is not uncommon for a recall population to contain a much larger number of vehicles than the often small percentage that actually contain the defective component or system that could reasonably be expected to produce the alleged defect consequence. Another example is an "inspect and repair" recall, where manufacturers direct consumers to bring their vehicles to authorized dealers for the purpose of having a vehicle component inspected to determine whether that component has a specified condition and, if found upon inspection, to have the component remediated.

23.     Motor vehicle fires are not an uncommon occurrence, with more than 168,000 vehicle fires reported nationally in 2017. A motor vehicle fire can have many causes.

a.     Just because a vehicle like Mr. Santos' Ford F-150 suffered a fire does not mean that even if fire originated in the vehicle that the fire was caused by a part subject to a recall. In my role as a Safety Defects Engineer and as a Director of the Office of Defects Investigation, I have conducted and reviewed many vehicle fire expert reports. Often, because of the intensity of the fire, the evidence for determining origin and cause of a fire is consumed in the fire. I am not aware of any forensic investigation performed on Mr. Santos' vehicle to determine the origin and cause of the fire.

b.     In my experience, examination of the vehicle is crucial to determine the cause of a vehicle fire. If the vehicle is not available for examination, a definitive conclusion cannot be drawn about the cause of the fire.

c.     I do not believe at this time that it is possible to determine the origin and cause of the fire that consumed Mr. Santos' vehicle.

### BACKGROUND INFORMATION ON RECALLS

24.     Of the hundreds of recalls initiated each year, the vast majority do not involve any influence by NHTSA through its investigative process. In most situations, the vehicle manufacturer identifies through its internal analysis of available data (warranty, field reports, consumer complaints) that a potential defect trend may exist. This is normally followed up by testing and collection and further analysis of other data sources before presenting findings to a decision-making body in the corporation. Once a formal determination is made that a safety defect exists that warrants a recall, the manufacturer must give formal notice to NHTSA that a recall is forthcoming. Shortly after receiving the manufacturer's notice, NHTSA will produce a public file for the recall on its website, safercar.gov, providing a synopsis of the issue along with copies of relevant documents produced both by the manufacturer and the agency. The news media monitors these public postings closely and, depending on the media's perception of the severity of the consequence and the scope of the recall, certain recalls can garner significant media publicity. This can be beneficial in improving public awareness of a recall. Within 60 days of its notice to NHTSA, the manufacturer must provide similar notice to vehicle owners of the population of vehicles

CASE NO. 3:17-CV-02447-RS

REPORT OF FRANK BORRIS

determined to potentially contain the defect condition.  If the recall remedy is available at the time of this first notice, the letter will instruct vehicle owners to contact their dealer and make an appointment to have the vehicle repaired.  If the remedy is not available at the time of the first notice, the letter will merely describe the defect condition, the potential consequence, including a statement of risk, and advise owners that a second notice will be sent once the remedy is available.

25.    In a much smaller number of cases, the recall decision by the manufacturer only comes about as a result of the influence and pressure applied by NHTSA through its investigative process.  Once a recall decision is made, the process followed is identical to that described above.

26.    Central to the recall notification process is the notification letter sent to registered owners of motor vehicles by the manufacturers.  The manufacturer is the only entity required by regulation to notify the registered vehicle owners of a recall.  A single recall can involve multiple mailings over time.  The manufacturer would use names and addresses obtained by a combination of vehicle sales records, registration information provided by consumers directly, and information obtained from state department of motor vehicles ("DMVs").  Manufacturers intend to reach consumers who purchased their motor vehicles used from independent motor vehicle dealers by making mailings to consumers who have provided registration information directly to the manufacturer as well as registration information obtained from state DMVs.

27.    The manufacturers are required to send drafts of its letter notification to NHTSA at least five days before the planned mailing date of the notice to consumers for NHTSA's review.  The notification program is designed to create a reasonable expectation that the majority of owners of a vehicle with an open recall would receive a notification letter.  While imperfect, mailed notice has proven, by experience, to have reached the majority of consumers who own vehicles subject to an open recall.  This can be seen in recall repair rates, which for recent year models, typically average approximately 76 to 80%.  Based on this experience, it is reasonable to infer that a majority of persons who purchased F-150s from CarMax with an open SCDS recall would have received actual notice of an open recall.  It is my opinion that the vast majority of consumers who purchased a vehicle from CarMax subject to the SCDS recall would have received actual notice of that recall by April 27, 2014.

CASE NO. 3:17-CV-02447-RS

REPORT OF FRANK BORRIS

28.    I do not infer that a repair rate of 80% implies that 20% of consumers did not get the recall notice. To the contrary, it is a well-known phenomenon that many consumers receive a recall notice, but do not get the recall remedied. NHTSA is well aware of this risk and goes to significant efforts in its review of manufacturers' notices to consumers to ensure that they contain appropriate language describing the risk associated with the alleged defect in the hope that it will motivate consumers to take action. In August 2014, NHTSA made effective a new regulatory requirement that all recall notice envelopes include a special marking designed to increase its visibility and convey its urgent nature.

29.    The operation of the mailed notice system and consumers' reaction to it can be seen in the facts of Mr. Santos' case.

30.    You can see the operation of the mailing system in the Ford deposition I have been provided in this case. According to the deposition and associated records, Ford made eight separate mailings over nine years attempting to give recall information to the owner of Mr. Santos' F-150. The Ford deposition also illustrates a known weakness in the recall notification system. There is no evidence that Ford addressed the notification to either CarMax or Mr. Santos, even though both owned the vehicle for a period of time.

31.    Consumers' reaction to the manufacturers' notices can be seen in Mr. Santos' deposition, where he testified that he did not have a recall remediated unless he considered it sufficiently serious to warrant that effort.

32.    In addition to NHTSA, the FTC has also addressed motor vehicle recall notification and remediation. Specifically, the FTC has repeatedly examined several options that used motor vehicle dealers could potentially use in notifying the public about open recalls and remediating any open recall. Working in collaboration with NHTSA, the FTC determined that it was inadvisable to rely on used motor vehicle dealers to provide recall VIN-specific recall information. Instead, the FTC focused on the federally-mandated Buyers Guide which is required to be posted on all used motor vehicles offered for sale by a used motor vehicle dealer. The Buyers Guide is an official federal form, that the used motor vehicle dealers are required to use as-is. In 2016, the FTC decided

to add additional language to this form, disclosing the possibility of open recalls and instructing consumers how to obtain VIN-specific information.

33.    The FTC first considered this starting in 1984, when it concluded that a "known defect disclosure would not serve the public interest."[1]

34.    It was again reconsidered in 1995.  At that time, the FTC determined that "[t]here was no new evidence indicating that reliable information would be disclosed if such a provision [requiring disclosure of known defects] were required . . .."[2]

35.    It was again reconsidered in 2012.  The FTC again affirmed its long-standing decision not to require disclosure of known defects, citing the lack of data supporting such a requirement and the FTC's "overall goal of decreasing consumers' reliance on dealer-controlled information when making a used car purchase decision."[3]  This decision reflected the FTC's belief that consumers' independent inquiry into a vehicle's condition is more likely to yield reliable information than a requirement that dealers provide such information.  Further, educating the public on how to acquire recall information for themselves has potential future safety benefits for those that develop a habit of routinely checking their vehicle VIN for open recalls.

36.    It was again considered in 2014 to 2016 in a rule-making period.  And again the FTC determined that requiring used motor vehicle dealers to disclose information about open recalls was not the best method to get reliable information to the public.  Instead, the FTC found that the best practice regarding recalls was to allow consumers to research vehicle history reports, which include recall information, for themselves, rather than to require dealers to investigate and disclose recall information.  The FTC stated that "revising the Buyers Guide by directing consumers to obtain a vehicle history report should help reduce consumer injury and deception that could result from undisclosed or deceptive disclosure of title brands or other pieces of problematic history."[4]

37.    In sum, the FTC has rejected repeatedly the idea that used motor vehicle dealers should have any role in providing recall notifications or remediating open recalls.  Instead, the FTC

---

[1] 49 Fed. Reg. 45,692, 47,716 (Nov. 19, 1984).
[2] 60 Fed. Reg. 62,195, 62,197 (Dec. 5, 1995).
[3] 77 Fed. Reg. 74,759 (Dec. 17, 2012).
[4] 81 Fed. Reg. 81,672 (Nov. 18, 2016).

CASE NO. 3:17-CV-02447-RS

REPORT OF FRANK BORRIS

finally decided in 2016 that used motor vehicle dealers' duty would be solely limited to using the appropriate form of Buyers Guide, which includes some government recall notification language.

38.     As described above, prior to 2014 the notification system relied very heavily on manufacturers' mailed vehicle recall notices.  While these notices reasonably could be expected to reach a great majority of consumers who owned vehicles subject to an open recall, nevertheless, repair rates almost never approach 100%.  Moreover, as described above, a known weakness in the notification system was the difficulty of members of the public being able to obtain vehicle-specific recall information on their own initiative.  For example, a consumer who had read in the newspaper about a recall affecting a given make, model, and model year, would not have access to a single, uniform, easy-to-access source of information about whether the recall actually affected a vehicle owned by that consumer.  Instead, the owner of the vehicle typically would need to contact the manufacturer's call center or a franchise dealer, provide a 17-digit VIN number, and hope to receive recall information orally.

39.     In terms of obtaining VIN-specific recall information, independent motor vehicle dealers were in no better position than consumers to obtain this information.  Typically, obtaining information involved a phone call to a franchise dealer, a direct competitor.  This process would be time consuming and have many points of potential failure, such as a mistranscription of the oral reading of the seventeen-digit VIN number or a mistake by a dealership employee's efforts to look up information on the manufacturer's warranty system.

40.     Effectively, independent motor vehicle dealers were shut out of the recall remediation process.  Independent motor vehicle dealers do not have access to specific tools or parts from the manufacturer to fix open recalls.  Independent motor vehicle dealers do not have access to training or information specifying how to fix open recalls.  More importantly, independent motor vehicle dealers are not authorized by manufacturers to provide free open recall remedies or request reimbursement from the manufacturer.

**ENACTMENT OF MAP-21 AND DEVELOPMENT OF NHTSA VIN LOOK-UP**

41.     Congress realized the problems with access to reliable, consistent information regarding open recalls and problems which impeded the public dissemination of recall information.

As a result, in July 2012, Congress enacted the Moving Ahead for Progress in the 21st Century (MAP-21) Act.  Among other significant changes, this law granted authority to the Secretary of Transportation, in his discretion, to conduct a rulemaking requiring each manufacturer to provide its open safety recall information on a publicly accessible Internet Web site.  The law did not directly speak to the mechanism for implementing its requirements, leaving NHTSA to use its discretion to fill any ambiguity.  Also, MAP-21 is silent with respect to who is required to make safety recall information available, which manufacturers are subject to the requirement, the types of safety information to be made available, and how and when the information is placed on the Internet.  Prior to this, there was no comprehensive service available to reliably acquire near real time open recall information.  The Secretary of Transportation delegated his authority to the NHTSA Administrator and the agency considered a number of options before publishing its Final Rule on August 20, 2013.

42.    The Rule gave manufacturers until August 20, 2014 to make their open recall information available and searchable by VIN.

43.    To its credit, NHTSA also included certain technical specifications designed to ensure each manufacturer's website would meet certain criteria for functionality, format, and ease of use.  Lastly, NHTSA's specifications required the manufacturers' websites to allow secure communication with NHTSA's website safercar.gov.  This allows consumers to go to one website to search for open recalls regardless of the vehicle manufacturer.  The new service deployed on schedule and has garnered significant use.

44.    It is important to note that NHTSA developed the specifications for this new service based on the needs of the average consumer who owns one or more vehicles.  Specifically, the user interface only allowed one VIN to be checked per search.  It was not designed to meet the needs of commercial businesses, rental fleets or other entities with many vehicles.  This functionality was considered at the time of initial development but was tabled to focus on the needs of the average consumer.

**VEHICLE RECALLS VS. DEFECTS**

45.    Many vehicle owners are casually familiar with the terms recall and defect as it relates to automobiles, but most don't understand important distinctions between the two.  Defects can and do occur for many different reasons and at varying frequencies across virtually all makes of vehicles.  However, all defects do not rise to the level of *unreasonable risk* as often described by NHTSA.  Some defects are limited to quality and do not result in any significant safety consequence.  When this occurs, the manufacturer may or may not offer corrective action by way of warranty, or some field action such as a customer satisfaction campaign.  Other defects may have some level of safety consequence, but the frequency and/or severity are sufficiently low such that they don't create an unreasonable risk to motor vehicle safety.  NHTSA evaluates tens of thousands of vehicle complaints each year, but only a small percentage are escalated for further review and still fewer demonstrate a safety defect trend that warrants formal investigation.

46.    The language in the statute, "a defect related to motor vehicle safety," is not easily applied to all the issues identified across the nearly 265 million registered vehicles on the road today.  Instead, NHTSA relies upon its prior precedent, case law, engineering judgement, testing and investigation to make determinations as to whether a particular safety related defect presents an unreasonable risk to motor vehicle safety that warrants a recall.

47.    Similarly, vehicle manufacturers monitor their fleets and process vast amounts of warranty and other data, including complaint data from NHTSA, looking for potential defect trends that warrant further scrutiny or corrective action.  In fact, the majority of recalls are initiated by vehicle manufacturers with no influence by NHTSA.

48.    Under the law, recalls are required in two different situations:  first, when conditions present an unreasonable risk to motor vehicle safety; second, when conditions of the vehicle do not accord with a specific federal motor vehicle safety standard.

49.    Even if a decision is made that an issue satisfies the statutory standard for a recall, different recalls prevent a wide range of degrees of risk.  This can be seen in an industry standard practice for manufacturers that treat a rare subset of recalls being of such an unreasonable risk to motor vehicle safety that consumers are advised not to drive vehicles until they are repaired.

CASE NO. 3:17-CV-02447-RS

REPORT OF FRANK BORRIS

50.     While NHTSA has not to date differentiated between types of recalls in terms of risk, NHTSA has recognized that in fact different kinds of recalls create different kinds of risks and has sought regulatory authority to treat recalls that pose "imminent hazard" differently than other types of recalls.

51.     Once a decision is made that a basis for a recall exists in a fleet of vehicles, the next step is for the manufacturer to determine the scope of the recall, compile the VIN numbers of potentially affected vehicles, and collect owner address information to mail letters advising them of the risk along with instruction to make an appointment with a dealer for repair.  This scope determination is very important as manufacturers can face civil penalties if they set the recall population too small.  NHTSA reviews every recall decision to ensure the public notice meets regulatory requirements and that the scope and remedy are reasonable.  Manufacturers will often err on the side of including more vehicles in the recall scope than those that actually contain the defect to ensure the smaller portion actually containing the defect or those likely to experience the safety consequence are captured and repaired.  Below are a few examples:

   a.     A manufacturer identifies a high failure trend through warranty data analysis for wiper motors in certain vehicles of the same make and model year.  After researching the issue with the supplier of the wiper motor, it is determined that a manufacturing process lost control for 15 days of production.  Not all the wiper motors will fail early, but the warranty rate is 400% higher than normal failure rates.  The safety consequence merits a recall based on NHTSA's precedent, but there is no way to accurately tell which vehicles contain the wiper motors what will fail prematurely and without warning.  Based on shipping records, inventory and other warranty data, the manufacturer is able to identify specific dates where vehicle production corresponds to the presence of suspect wiper motors in inventory at the plant.  The recall population is set to capture all the vehicles produced on those days plus a buffer of vehicles manufactured just a few days before and after the high-risk production population.  This means there is a significant

percentage of vehicles in the recall population that don't actually contain the defect.

    b.    A manufacturer identifies a small number of reports involving fires in certain vehicles of a specific make and model year range. Through investigation, the fires were determined to have only occurred just after the vehicle was operated off road through heavy brush or tall grass. The root cause involves a brush guard on the underside of the vehicle that is designed to protect the exhaust from impact damage when operating the vehicle off road over rough terrain. Over time while driving in specific conditions, the edge of the brush guard can catch debris which accumulates near hot exhaust components. If enough of the material makes contact with the exhaust and the vehicle is driven hard enough to raise exhaust temperatures, an underbody fire could develop and spread to other combustible materials. In this case, only a very small percentage of owners of these vehicles actually drive them in the specific conditions that could cause a fire. However, since the manufacturer has no way of determining which owners will drive off road and which will not, the entire population of vehicles with the same design must be recalled.

52.    NHTSA's recall regulation, 49 C.F.R. Part 573.6, contemplates the likelihood that not all vehicles subject to a recall actually contain the defect and directs manufacturers to identify this distinction in its notice to the agency:

(c) Each manufacturer shall include in each report the information specified below…

(2) Identification of the vehicles or items of motor vehicle equipment potentially containing the defect or noncompliance, including a description of the manufacturer's basis for its determination of the recall population and a description of how the vehicles or items of equipment to be recalled differ from similar vehicles or items of equipment that the manufacturer has not included in the recall…

(3) The total number of vehicles or items of equipment potentially containing the defect or noncompliance, and where available the number of vehicles or items of equipment in each group identified pursuant to

CASE NO. 3:17-CV-02447-RS

REPORT OF FRANK BORRIS

1  paragraph (c)(2) of this section.

2
   (4) The percentage of vehicles or items of equipment specified pursuant to
3  paragraph (c)(2) of this section estimated to actually contain the defect or
   noncompliance…

4      53.    To demonstrate this in a recent recall, take the example of Ford's recall (18V-894)

5  involving certain model year 2015-2019 F-150 pickup trucks.  This recall action was taken to

6  address the risk of fire related to engine block heaters.  In its report to the agency and pursuant to

7  paragraphs (3) and (4) of the regulation above, Ford identifies that in order to capture and remedy

8  the 6% of the population that actually contain the defect, it must recall 410,289 vehicles.

9      54.    At the time NHTSA closed its investigation (EA05-005) of the SCDS recall in

10 August of 2006, out of a total population of more than 3 million vehicles associated with the SCDS

11 recall, the recall associated with Santos' truck, Ford and NHTSA collectively identified 65

12 incidents that appeared to allege fire related to the SCDS switch, or 0.002%.

13     55.    As part of ODI's investigation, it noted that there were "two significant stages in

14 failure associated with the alleged defect.  The first stage involves the development of a leak path

15 from the hydraulic side of the switch to the electrical side of the switch.  The second stage involves

16 the corrosion of the switch contacts and the development of a resistive short to ground that generates

17 heat in the switch cavity, which can result in melting of the plastic base and, in some cases, fire."

18     56.    As part of its analysis, ODI found that:

19     The leak results from fatigue failure of the Kapton allowing brake fluid to

20     move from the hydraulic side of the switch to the electrical side of the switch.

21     Fatiguing of the Kapton diaphragm results in cracks initiating in the Teflon layer

22     . . . of the laminate.  Once the Teflon layer has been breached, the Kapton is then

23     compromised by the water that is contained in the brake fluid.  DuPont, the

24     manufacturer of the Kapton material, indicates that hydrolytic degradation of the

25     Kapton can be caused by water-contaminated brake fluid penetrating a cracked

26     Teflon layer.  A Kapton substrate that has been degraded from such exposure can

27     become brittle and crack. . . .

28

CASE NO. 3:17-CV-02447-RS

                                                        REPORT OF FRANK BORRIS

Once a leak develops, water-contaminated brake fluid makes its way into the electrical cavity of the switch and corrodes the switch electrical contacts. A brake fluid slurry may fill the gap between the electrical contacts and the grounded hexport body acting as an electrolytic medium. In this condition, conductive metal atoms are deposited on the negative electrode and can grow (dendrites) on the grounded base plate (cathode) towards the energized switch (anode). As dendrites grow and accumulate, their electrical resistance drops and their current carrying capacity increases. If the dendrites complete an electrical pathway between power and ground, increased heat and arcing can cause brass and copper beads to form in the plastic base. If the plastic housing experiences high enough temperatures, ignition of the switch might result in an open flame. In some instances, the combustion is confined to the switch housing. But, in other cases, depending on factors like orientation of the switch and the proximity of other combustive materials, flames can propagate to the area surrounding the brake switch.

57.    ODI also noted that "[i]noperative speed control [i.e., cruise control] is the most commonly reported symptom of switch failure." In addition, ODI noted that consumers often noticed a leak of brake fluid under their vehicles as a symptom of SCDS failure. ODI also noted that some consumers reported difficulty shifting their vehicles out of park, inoperative brake lamps, and illumination of the brake warning light on the instrument panel, each associated with SCDS failure.

58.    ODI reported that a combination of factors were required for failure:

First, the SCDS must be located in a circuit that is powered at all times. If the circuit on the vehicle that contains the SCDS is not powered, there is no source to produce the energy required to start heating any of the SCDS components. The second factor is a requirement that the vehicle have a brake system design that generates a vacuum in the brake system high enough to flip the orientation of the Kapton diaphragms in the SCDS. When the Kapton seals fail in an SCDS it is most likely the result of fatiguing of the material. It has been shown that this fatiguing

can result from repeated pressure cycling of the material when the cycle includes a vacuum at the end of the cycle strong enough to flip its orientation. The third factor requires that the SCDS is mounted in the master cylinder in any other orientation than vertically down. When the SCDS is mounted in a vertically down orientation, and the SCDS has developed a leak, the corrosion products that may develop within the electrical cavity settle in the switch away from the grounded base. When the corrosion products settle in this way they are not likely to promote the development of a short circuit.

59.     Even though Mr. Santos' vehicle was subject to a recall, this in and of itself does not prove that the SCDS component of his vehicle actually shorted to ground, which is a necessary first step in a chain of events required to start a vehicle fire. Therefore, just because a vehicle was subject to the 05S28 recall, its SCDS switch was not necessarily defective.

**SANTOS VEHICLE FIRE**

60.     There is no evidence to clearly support that the 2002 Ford F-150 (VIN 1FTRW07682KE25148) caught fire as the result of a failure of the speed control deactivation switch (SCDS). While this vehicle was included in the scope of Ford's recall (05V017) to address the risk of fire related to SCDS failure, the vehicle may have caught fire from other causes.

61.     Although Ford made a decision to recall millions of vehicles originally equipped with a SCDS manufactured by Texas Instruments, not all the vehicles subject to the recall population contain a safety defect that will cause a fire. NHTSA's closing reports for its investigation (EA05-005) describes the failure mechanism of the SCDS (page 4):

> There are two significant stages in a failure associated with the alleged defect. The first stage involves the development of a leak path from the hydraulic side of the switch to the electrical side of the switch. The second stage involves the corrosion of the switch contacts and the development of a resistive short to ground that generates heat in the switch cavity, which can result in melting of the plastic base and, in some cases, fire.

62.     What is important to note here is that if an SCDS fails internally such that brake fluid, with sufficient water content, migrates to the electrically charged side of the SCDS, there are

a number of possible outcomes other than a vehicle fire including, the switch could corrode and disable the brake interlock, cruise control, and other associated circuits. The switch could develop an internal short to ground and blow the fuse alerting the owner of a problem. The SCDS could melt without combustion. Lastly, the SCDS could ignite then quickly self-extinguish.

63.    Ford's testimony in deposition revealed awareness of instances where the original SCDS has lasted the life of the vehicle without incident. This should be expected for any device built in such large quantities and designed and tested to operate for a finite life. In the case of the SCDS, it was designed to withstand 500,000 pressure impulse cycles at 2 Hz with the following conditions: 107°C (224°F) ambient temperature, 135°C (275°F) brake fluid temperature, and 0 to 1,450 psi cycling pressure. These conditions are much more severe than would be expected in a real-world application. However, due to other factors not accounted for in the validation test conditions, some switches failed but many worked as designed for the life of the vehicle.

64.    I am a professional user of fire investigation reports. Specifically, in the use of determining whether a vehicle fire could be attributable to a specific component. In the business of professional use of fire reports and investigation results, it is not proper to conclude the cause and origin of a vehicle fire merely based on the presence of a component that is the focus of an open recall due to a fire risk. Before a conclusion can be reached, the vehicle itself must be examined. In the course of my years of work at NHTSA, I have seen many examples of data showing the presence of vehicle fires in populations of motor vehicles both under recall and not under recall. I note, moreover, that it is a common experience for a consumer who suffered a vehicle fire to attribute the fire to a recall issue, even if the fire occurred after the recall issue was remediated. You can see this in Mr. Santos' deposition testimony. His property suffered a fire of undetermined origin. Once he learned of the open recall, he immediately attributed the fire to the SCDS, even though he had no evidence to do so.

65.    Motor vehicle fires are not an uncommon occurrence and as indicated by the U.S. Fire Administration ("USFA"), more than 168,000 vehicle fires were reported nationally in 2017. Indeed, Mr. Santos testified that his daughter has also experienced a motor vehicle fire. Also, according to the USFA the majority 62% of all vehicle fires originate in the engine compartment,

running gear, or wheel areas. This is consistent with the fact that vehicle engine compartments house a high-density of complex electrical and mechanical components, piping systems and reservoirs containing flammable liquids, multiple heat sources that can initiate ignition, and various combustible materials. It is very challenging to determine the exact cause of a vehicle fire and nearly a fourth a those investigated do not result in a causal determination. This is due to extensive vehicle damage caused by vehicle fires which frequently consume critical evidence necessary to identify cause and origin.

66.     With respect to the Santos Vehicle, it could have caught fire for reasons other than the SCDS. Many vehicle fires occur in unattended vehicles with the engine off and while parked. Even though the vehicle is at rest, certain electrical circuits maintain a connection to the vehicle battery and can be the source of fire with the ignition off from various root causes. Common sources of electrical fires include, but are not limited to, damage caused by rodents, chafing of insulation due to vibration against a metal surface, heat induced insulation, degradation from hot engine compartment or exhaust components, or other mechanical or electrical system failures. An example of this can be found in the Santos deposition (page 182-184) where he admits to un-commanded operation of a power window switch. This could indicate the presence of an intermittent electrical short or a mechanical failure of a switch that could overstress the power window motor, associated wiring, relay or other circuitry potentially causing a fire.

**DOCUMENTS RELIED ON OR CONSULTED**

67.     A listing of all documents I relied on or consulted in drafting this report is attached hereto as **Exhibit B**.

//

//

//

//

//

//

//

- 19 -

1  I declare under penalty of perjury under the laws of the United States that the foregoing is true and

2  correct.

3

4  Executed on February 18, 2019
   in Washington, D.C.                                      Frank S. Borris, II

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 3:17-CV-02447-RS

                                                        REPORT OF FRANK BORRIS